UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - FLINT

KENNETH W. RODMAN,
        Plaintiff,

vs.                             CIVIL NO. 2:07-CV-10407

MICHAEL J. ASTRUE,         DISTRICT JUDGE GEORGE CARAM STEEH
                                 MAGISTRATE JUDGE STEVEN D. PEPE
          Defendant          .
_____/


## REPORT AND  RECOMMENDATION

### 1.    Background

      Plaintiff, Kenneth W. Rodman, brought this action under 42 U.S.C. §405(g) to challenge

a final decision of the Commissioner finding that he was not entitled to Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act.  Plaintiff and Defendant both filed

motions for summary judgment.  Both motions have been referred to the undersigned pursuant to

28 U.S.C. § 636(b)(1)(B) and (C).  For the following reasons, **IT IS RECOMMENDED** that

Defendant's motion for summary judgment be **GRANTED** and the Plaintiff's motion be **DENIED**.


### A.    Procedural History

      Plaintiff, Kenneth Rodman, applied for disability insurance benefits ("DIB") and a period

of disability in September 2003, alleging disability since March 29, 1997, due to severe general

anxiety and spasmodic dysphonia grossly affecting his speech (R. 47F, 53).  Plaintiff's

application was denied on December 26, 2003 (R. 39-42).  Plaintiff appeared, with counsel, at a

hearing before administrative law judge ("ALJ") Alfred A. Varga on August 31, 2005 (R. 29-33,

1

178-207).  ALJ Varga's December 21, 2005, decision determined that Plaintiff was not eligible

for Social Security benefits (R. 13-28).  The Appeals Council denied review on August 25, 2006

(R. 5-7).  On December 22, 2006, the Appeals Council denied a request for reopening on the

basis of what was asserted to be  new and material evidence (R. 3-4).

**B.**     **Background Facts**

      **1.**     ***Plaintiff's Hearing Testimony and Statements***

      Plaintiff was 49 years old at the time of the hearing (R. 181).  He earned a master's

degree in mechanical engineering from Michigan State University in 1985.  Plaintiff lives at

home with his mother, has no friends, and only leaves the house to go shopping and to take his

mother to the doctor or his sister's house (R.189-91).  Plaintiff attended nursing school,[1] but

dropped out in the first semester (R. 192).  Plaintiff's hobbies include surfing the internet and

writing screenplays, poetry and songs (R. 189-90).

      Plaintiff takes Valium and Soma, which calm him down (R. 193).  When the medication

wears off, Plaintiff goes into a panic, begins shaking and is unable to drive (R. 193-4).

      Plaintiff last worked[2] as an engineer for the City of Detroit until he experienced a nervous

breakdown (R. 181-82).  While employed, for one and a half months, by the City of Detroit,

Plaintiff had problems and confrontations with his supervisors and co-workers.

      Plaintiff worked from October 1995 to January 1996 as a security guard, but got into

---

[1] The transcript references nursing school, but Dr. Luby's notes indicate that Plaintiff also
attended a Carribean medical school for a brief period.  *See* R. 161 - 64.

[2] Plaintiff's last day of work was March 28, 1997.

confrontations with customers and co-workers (R. 183).  For four month until September 1995, Plaintiff worked for the Army drawing diagrams and completing tasks for his supervisor (R. 185).  At this job, Plaintiff had trouble relating to his colleagues, and left the job on account of workplace stress (R. 186-87).

From August 1991 until May 1994, Plaintiff was assigned over 100 temporary jobs by Kelly Services (R. 187).  These jobs were several weeks in duration, but would "end up lasting one day," and the longest Plaintiff worked at one job was 2 - 3 months (R. 188).  Plaintiff estimates that he was fired from "at least" 90 percent of these jobs (R. 192).  He left or quit the others (R. 192).

Plaintiff stated that there is no job that he could return to given his anxiety and speech difficulties.  Plaintiff also has experienced semi-chronic back pain which arose while working for Kelly Services (R. 195).  X-rays found nothing wrong with his back.  Plaintiff has trouble both working around others and at the pace dictated by his employer.

## 2. *Medical Evidence*

Given the unique nature of Plaintiff's impairment, and his attorney's assertion that certain of his psychiatrist's reports were a product of confusion and the Appeals Council erred in refusing to reopen the case in light of a clarification from his psychiatrist, the medical record is set out in far greater detail than in either party's brief.

Medical test  reports[3] from  the Speech and Language Pathology Department at William Beaumont Hospital indicate that Plaintiff possessed normal vocal cords, and that he experienced

---

[3]Three of the four pages of the Medical Record Reports are unreadable.

improvement in his voice (R. 102-05).  A June 28, 1985, report notes that Plaintiff was

discharged from treatment because  he was moving to Los Angeles (R. 104).

March 10, 1988, intake and assessment records at Comprehensive Psychiatric Services,

P.C., note Plaintiff's history of stuttering and labored speech attributed to anxiety (R. 171 - 75).

Prior to intake, Plaintiff visited an ears, nose and throat specialist; five psychiatrists and four

speech pathologists to no avail.

On April 8, 1988, Plaintiff was examined by Elliot D. Luby, M.D., who observed that

Valium appears to be the only drug which has controlled Plaintiff's intense social anxiety and

speech problems (R. 170).  On June 24, 1988, Dr. Luby reviewed Plaintiff's 1985 neurological

exam showing him to have a "hysterical _____"[4] (R. 169).  It was noted that Plaintiff cannot

talk without Valium, and his prolonged experiences with speech pathologists yielded in no

improvement.  On August 16, 1988, Dr. Luby indicated that Plaintiff was treated with Klenopin,

and while effective, Plaintiff believed that Valium was more effective (R. 168).

On October 14, 1988, Dr. Luby remarked that while Plaintiff has worked 3 months at one

job still there is "no alternative but to keep him on Valium 10 mg" (R. 167).  On August 17,

1989, Dr. Luby stated that when Plaintiff is taken off Valium he cannot function, his body

becomes rigid and he cannot speak (R. 165).  Dr. Luby opined that he did not "understand the

mechanism."  On March 5, 1990, Dr. Luby examined Plaintiff who quit his job to return to

school so that he could take pre-med classes, and on June 28, 1990, Dr. Luby learned that

Plaintiff completed his pre-med requirements and had been accepted to a Caribbean medical

school (R. 164).  Dr. Luby was convinced that Plaintiff could not function at medical school

---

[4] The word on the report is illegible.

without Valium, on August 16, 1990, wrote "To Whom It May Concern" stating that Plaintiff suffered from a severe anxiety disorder which caused a speech defect that lacks an organic basis (R. 163). Plaintiff has undergone psychotherapy and speech therapy but only Valium has alleviated his symptoms.

March 8, 1991, notes indicate that Plaintiff left medical school, and that Dr. Luby suggested Plaintiff return to engineering (R. 161). On September 6, 1991, Dr. Luby learned that Plaintiff was applying to both medical and nursing schools, and was no longer seeing a speech pathologist (R. 160). At Plaintiff's next examination, Dr. Luby noted that Plaintiff refused a Botulinum toxin injection (R. 160). On March 6, 1992, Plaintiff agreed to undergo Botulinum injections to address his spastic dysphonia (R. 159). Plaintiff continued taking nursing courses and working part-time as an engineer. In a March 18, 1992, letter to Elliot Ruby, M.D., Michal Rontal, M.D., stated that Plaintiff can sing, talk with falsetto and whisper without difficulty (R. 106-07). Dr. Rontal's impression was adductor spasmodic dysphonia, and he suggested that Plaintiff receive 5 Botulinum toxin injections which Plaintiff agreed to undergo.

On June 5, 1992, Dr. Luby observed that the Botulinum injections were very effective enabling Plaintiff to receive a smaller dose of Valium (R. 159). On September 3, 1992, Dr. Luby determined that the Botulinum injections were a "complete failure" as Plaintiff lost his voice for six weeks after the injection, and when his voice returned it remained normal for only seven weeks (R. 158). On December 3, 1992, Dr. Luby recorded that Plaintiff was considering having another Botulinum injection, but noted on March 11, 1993, that Plaintiff did not repeat the injection (R. 157-58).

On September 8, 1993, Dr. Luby treated Plaintiff for a strained back which he injured at

work (R. 157).  On December 3, 1993, Plaintiff's speech was under "excellent" control (R. 156).

On  March 9, 1994,  Dr. Luby opined that Plaintiff does not abuse Valium and is not

psychologically dependant upon it, but would have to cease use slowly (R. 156).  Plaintiff

continued his 10mg dose of Valium.  On December 23, 1994, when  Plaintiff stated that he might

be hired by the City of Detroit, Dr. Luby noted that holding the job will be difficult as Plaintiff

tends to "migrate" (R. 154).  Plaintiff's throat impairment was still treated with Valium as "all

other remedies have failed."  On March 28, 1995, Dr. Luby noted that Plaintiff was still about to

be employed by the City of Detroit (R. 154).  Regarding Plaintiff's Valium dosage, Dr. Luby

analogized it to the maintenance dose of medicine given epileptics.  On May 5, 1996, Plaintiff

presented with a voice that was easily understandable and fluent (R. 149).

On July 12, 1996, Dr. Luby noted that Plaintiff "seems not able to hold a job," but is not

abusing Valium, denied obtaining it from other sources and did not appear sedated (R. 147).  On

October 25, 1996, Dr. Luby reported that Plaintiff's internist is prescribing Zoloft (R. 146).  On

April 16, 1997, Dr. Luby remarked that "Valium is the only drug which works" for Plaintiff (R.

144).  Dr. Luby learned that Plaintiff had quit his job with the City of Detroit.  On October 8,

1997, Plaintiff informed Dr. Luby that he wanted to stop using Valium to take Dilantin, but Dr.

Luby suggested 250 mg of Depakote (R. 142).  On November 12, 1997, Plaintiff told Dr. Luby

that Depakote was not having the same effect as Valium, and by December 22, 1997, Plaintiff

stopped taking it (R. 140-41).

On April 6, 1998, Dr. Luby observed that Plaintiff's head was shaved in a "peculiar"

manner (R. 139).  Plaintiff's speech appeared normal, and he reported that his sleep and appetite

were normal, but he still did not have a job.  On July 6, 1998, Plaintiff informed Dr. Luby that he

does not think he will work again (R. 138). On October 5, 1998, Dr. Luby remarked that Plaintiff's speech problems appear to be related to anxiety and not some organic problem (R. 137).

On January 4, 1999, Dr. Luby noted that Plaintiff has many schizoid features, is socially isolated and appears not to need human relationships (R. 136). Plaintiff has no delusions and denied having hallucinations. He had started working at home as a day trader of stocks. On January 9, 1999, Dr. Luby learned that Plaintiff was re-enrolling in nursing school, and is convinced that he has an anxiety related speech disorder (R. 135).

On April 7, 2000, Dr. Luby noted that Plaintiff's problems seem "entirely anxiety related," he has no social life, but his sleep and appetite are fine (R. 131). On October 2, 2000, Dr. Luby learned that Plaintiff recently had an episode where he stuttered so badly he could not communicate (R. 129). At his January 8, 2001, visit to Dr. Luby, Plaintiff's speech was somewhat spastic and involved stuttering (R. 128). On April 2. 2001, Plaintiff brought Dr. Luby a note from a Harvard psychiatrist recommending that he be placed on Marinol to treat his throat condition (R. 127). Plaintiff requested a one week trial of Marinol instead of Valium, and Dr. Luby noted that Plaintiff stuttered badly and was extremely anxious about making the request. At his July 2, 2001, session, Plaintiff expressed more interest in tapering Valium and beginning Marinol (R. 126). On October 1, 2001, Dr. Luby noted Plaintiff's interest in Marinol, a drug used for the emesis of chemotherapy in oncology patients (R. 125). Marinol is a Schedule III drug, and Plaintiff's use of it would be "off label," but Dr. Luby thought it might be helpful in making him benzodiazepine free. On October 29, 2001, Dr. Luby observed that Plaintiff has been tapering off Valium without problems, but his speech has become more spastic requiring

slow, deliberate effort (R. 124). On January 28, 2002, Dr. Luby continued Valium because it normalizes Plaintiff's speech (R. 123).

On April 29, 2002, Dr. Luby conducted an annual progress report, reviewing Plaintiff's medications, discussing long term effects of Valium and continued the current prescriptions for three months (R. 121-22).

On July 14, 2003, Dr. Luby noted that Plaintiff's anxiety and speech problem were very well controlled, and stated that the addition of Soma had been quite helpful (R. 117). On October 13, 2003, Dr. Luby examined Plaintiff, and was informed that he was applying for Social Security disability benefits (R. 116) which were later rejected (R. 115).

On December 17, 2003, psychiatrist Thomas T.L. Tsai, M.D., conducted a Mental Residual Functional Capacity Assessment of Plaintiff (R. 84-87). Dr. Tsai found no significant limitation in Plaintiff's ability (1) to remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out very short and simple instructions; (4) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; (5) sustain an ordinary routine; (6) work in coordination with or proximity to others; and (7) make simple work-related decisions (R. 84). Plaintiff had moderate limitation in his ability to maintain attention and concentration for extended periods of time as well as his ability "to coworkers and peers without distraction or exhibiting behavioral extremes"[5] due to his general anxiety disorder (R. 86). His ability to (1) regularly work a full workday or week, and (2) to accept and respond appropriately to instruction were moderately

_____

[5]This quote is grammatically incorrect, but appears to suggest that Plaintiff's ability to *interact* (emphasis added) with others is only moderately impaired.

impaired due to anxiety disorder. Dr. Tsai stated that Plaintiff can do unskilled work.

Dr. Tsai completed a Psychiatric Review Technique Form which assessed Plaintiff's mental state from March 29, 1997, until March 31, 2002 (R. 88 - 101). Plaintiff had a "severe anxiety disorder" under Listing of 12.06 – Anxiety Related Disorders (R. 93 & R. 98). Limitations on Plaintiff's daily activities were rated as mild, and limitations regarding maintaining social function and concentration, persistence or pace were deemed "moderate." Plaintiff was recorded as having no episodes of decompensation.

On February 16, 2004, Dr. Luby filled out a Mental Impairment Questionnaire regarding Plaintiff (R. 109-115). Dr. Luby recorded that he had seen Plaintiff quarterly for 16 years, stating that Plaintiff has severe spastic dysphonia which is exacerbated by his anxiety, and global assessment of function (GAF) score of 50-60 [6] (R. 109). Dr. Luby indicated that Plaintiff's symptoms include: blunt, flat or inappropriate effect; persistent nonorganic disturbance of speech; apprehensive expectation; and seclusiveness or autistic thinking (R. 110). With regard to Plaintiff's mental abilities and aptitudes to do unskilled work, Dr. Luby indicated Plaintiff was "unlimited or very good" with regard to following: (1) remember work-like procedures, and (2)

---

[6]The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32. A GAF score of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." *Id.* A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *Id.* A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id.*

understand, remember and (3) carry out very short and simple instructions, and (4) ask questions and request assistance. He had limited but satisfactory abilities (1) to maintain attention for a two hour segment, (2) maintain regular attendance and be punctual, (3) sustain ordinary routine without special supervision, (4) make simple work related decisions, (5) accept instructions and respond appropriately to criticism, (6) respond appropriately to changes in routine work setting and (7) be aware of normal hazards and take appropriate precautions (R. 111). Plaintiff was seriously limited but not precluded in abilities (1) to work in coordination with or proximity to others without being distracted, (2) complete a normal workday or workweek without interruption from psychologically based symptoms, (3) perform at a consistent pace without an unreasonable number of rest periods, (4) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, (5) deal with normal work stress.

3.    *Vocational Evidence*

Vocational expert ("VE") Dr. Asa Brown characterized Plaintiff's past work for the City of Detroit as vocationally insignificant due to its short duration (R. 199). Plaintiff's work as a security guard was light, semi-skilled and part of it was sedentary. Plaintiff's work for the Army and Air Force was skilled and sedentary. Initially, the Kelly Services jobs were unskilled and medium, but after Plaintiff's back injury they were unskilled and light. VE Brown stated that the only transferable skills possessed by Plaintiff are due to his engineering degree.

ALJ Varga asked VE Brown a hypothetical question assuming someone of Plaintiff's age, education, work experience, sex, lateral transferable skills and the testimony presented at

the hearing, would such a person be able to perform any of Plaintiff's past work (R. 200)? VE Brown stated that such a person could not perform Plaintiff's prior jobs or any jobs to which he has transferable skills.

ALJ Varga asked if there were any jobs, even without transferable skills, that Plaintiff could perform. VE Brown opined that Plaintiff could perform two types of jobs where the important vocational factor is limited contact with others: either (1) a retail stocker/stacker on the second or third shifts or (2) an evening building cleaner. Being a stocker/stacker is medium exertional, and there are 4,200 such jobs in southeastern Michigan. As for an evening building cleaner, there are 3,500 light and 4,200 medium exertional jobs in southeastern Michigan (R. 200-01). VE Brown assumed that Plaintiff's workplace anxiety was due to interaction with others.

ALJ Varga posed a second hypothetical question assuming the same characteristics as previously discussed, but this time the individual in question could perform only light work; lifting 10 pounds regularly, never exceeding 20 pounds; requiring no work at unprotected heights, driving or climbing; being simple and routine in nature; and with limited or no contact with other people. VE Brown stated that 3,500 light, unskilled janitorial jobs would remain (R. 202-03), and it would take two days for Plaintiff to learn such a job.

Plaintiff's attorney questioned VE Brown asking how many jobs exist which allow for no contact with co-workers or supervisors. VE Brown stated that such a restriction would rule out competitive employment (R. 204-05).

## 4.     ALJ Varga's Decision

ALJ Varga found that Plaintiff was insured for benefits through March 31, 2002, and had not engaged in substantial gainful activity since the alleged onset date and prior to his last date insured (R. 27). Plaintiff has "severe" impairments of spastic dysphonia, or anxiety-induced speech disorder, and a generalized anxiety disorder, but none of these impairments equals any impairment listed in Appendix 1, Subpart P, Regulations No. 4. 20 C.F.R. § 404.

ALJ Varga determined that Plaintiff's assertions concerning his ability to work are not totally credible. Plaintiff has the residual functional capacity for less than a full range of light work, and is unable to perform the requirements of his past relevant work and has no transferable skills from any past relevant work, and transferability of skills is not an issue.

ALJ Varga found that there are a significant number of jobs in the national economy which he could perform including 3,500 cleaning jobs in southeastern Michigan. Accordingly, Judge Varga found that Plaintiff was not under a "disability" as defined in the Social Security Act, at any time through the date of decision (R. 26, 27).

## II.    ANALYSIS

## A.    Standards of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting*

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are

not subject to reversal merely because substantial evidence exists in the record to support a

different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v.*

*Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of

proving the existence of a substantial number of jobs that Plaintiff can perform, other than her

past work, the testimony must be given in response to a hypothetical question that accurately

describes Plaintiff in all significant, relevant respects.[7]  A response to a flawed hypothetical

question is not substantial evidence and cannot support a finding that work exists which the

Plaintiff can perform.

**B.**    **Factual Analysis**

Plaintiff asserts that error ALJ Varga erred by failing to properly weigh the opinion of

Dr. Luby, Plaintiff's treating physician (Dkt. # 6, p. 3 and Dkt. # 9, p. 8-11).  Plaintiff also

claims that the Appeals Council erred by refusing to reopen the matter to allow clarification from

---

[7] *See, e.g.*, *Varley v.  Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir.  1987)
(hypothetical question must accurately portray claimant's physical and mental impairments);
*Cole v.  Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir.  1987) (Milburn, J.,
dissenting) ("A vocational expert's responses to hypothetical questions may constitute
substantial evidence only if the questions posed accurately portray the claimant's
impairments."); *Bradshaw v.  Heckler*, 810 F.2d 786, 790 (8th Cir.  1987) ("The question must
state with precision the physical and mental impairments of the claimant."); *Myers v.*
*Weinburger*, 514 F.2d 293, 294 (6th Cir.  1975); *Noe v.  Weinberger*, 512 F.2d 588, 596 (6th Cir.
1975).

Dr. Luby[8] (Dkt. # 9, p. 12).

### 1.     *Proper Use of Treating Physicians' Opinions*

It is well established that the findings and opinions of treating physicians are entitled to substantial weight.  The case law in this circuit has stated that if adequately supported by objective findings, and if uncontradicted by other substantial medical evidence of record, a treating physician's opinion of disability is binding on the Social Security Administration as a matter of law.[9]  The administrative decision could reject a properly supported treating physician's opinion of disability if the record contains "substantial evidence to the contrary."  *Hardaway v. Sec'y of HHS*, 823 F.2d 922, 927 (6th Cir. 1987).

Under the Social Security Administration regulations, the Commissioner will generally give more weight to the opinions of treating sources, but it sets preconditions for doing so.  20 C.F.R. §404.1527 [SSI § 416.927].  The regulation also limits the scope of the subject matters on which the Commissioner will give a treating source opinion greater weight.  The Commissioner will only be bound by a treating source opinion when it is "well supported by medically

_____

[8]Because this evidence was not before the ALJ when he rendered the final decision of the Commissioner, it cannot be considered for substantial evidence review. *See Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 685 (6th Cir. 1992). The only purpose for which this Court can consider this additional evidence is to determine whether this case should be remanded to the agency pursuant to the sixth sentence of 42 U.S.C. § 405(g). *Cotton v. Secretary of Health and Human Services*, 2 F.3d 692, 695-96 (6th Cir. 1993). This court may remand the case if the additional evidence is new and material, and if there was good cause for failure to incorporate the additional evidence into the record at a prior hearing. 42 U.S.C. § 405(g) (sentence six); *See Wyatt*, 974 F.2d at 685; *Casey v Secretary of Health and Human Services*, 987 F.2d 1130, 1233 (6th Cir. 1993).

[9]*See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record." 20 C.F.R. § 404.1527(d) [SSI § 916.927(d)]. *See also*, S.S.R. 96-2p. In those situations where the Commissioner does not give the treating physician opinion "controlling weight," the regulation sets out five criteria for evaluating that medical opinion in conjunction with the other medical evidence of record. Those five criteria are:

> (1) the length, frequency, nature and extent of the treatment relationship, including the kind and extent of examination and testing sought from specialists or independent laboratories;
> (2) the supportability of the medical opinion based on medical signs and laboratory findings, with better explanations being given more weight, and whether the opinion includes all of the pertinent evidence as well as opinions of treating and other examining sources;
> (3) the consistency of the opinion with the record as a whole;
> (4) specialty, with greater weight given to relevant specialists;
> (5) and other factors which tend to support or contradict the opinion.

*Wallace v. Comm'r. of Soc. Sec.* 367 F. Supp.2d 1123, 1133 (E.D. Mich. 2005).

The regulation also limits the subjects upon which the Commissioner must defer to a treating source opinion to "the issue[s] of the nature and severity of your impairment[s]." 20 C.F.R. § 404.1527(d)(2), [SSI § 916.927(d)(2)]. Under 20 C.F.R. § 404.1527(e) [SSI § 916.927(e)], the Commissioner will not defer or provide special significance to treating source opinions on certain subjects that are "reserved to the Secretary" which includes treating physician opinions on a claimant's disability under the Listing, on residual functional capacity or a general and conclusory statement of disability or inability to work. Thus, while deferring in part to the court-created "treating physician rule," the Commissioner's 1991 regulation in large measure rejects prior circuit case law that gave enhanced weight to treating physician opinions regarding disability under the Listing, on residual functioning capacity, or on general statements

of disability.

In the present case, the portions of Plaintiff's treating physician's opinions to which the ALJ was required to defer, or at least treat with special significance, was the diagnosis of general anxiety and spastic dysphonia (or an anxiety-induced speech disorder) (R. 27). Indeed, ALJ Varga adapted these impairments in making his determination (R. 21-26). Plaintiff argues that the ALJ was also required to give deferential weight to Dr. Luby's observations that Plaintiff was unable to perform past relevant work, and is "disabled" (R. 24). Such a determination is reserved for the Commissioner to make. 20 C.F.R.§ 404.1527(e)(1); *Workman v. Comm'r of Soc. Sec.*, 105 Fed. Appx. 794, 800 (6th Cir. 2004)(A treating physician's conclusory statement that a claimant is disabled is not controlling because the ultimate determination of whether a claimant is disabled rests with the Commissioner.); *Wallace,* 367 F. Supp.2d at 1133. *See* 20 C.F.R. § 416.927(d) (providing that poorly supported opinions are entitled to little weight); *Bogle, v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993) ("[T]reating physician's opinions ... receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence.").

As discussed above, the ALJ expressly found Plaintiff's subjective allegations of incapacitating symptoms and limitations not fully credible.[10] Further, Dr. Luby's determination

---

[10] Plaintiff's testimony that while working for Kelly Services from August 1991 to May 1994, he was fired, often after a day, from 90% of over 100 temporary jobs because of his problems dealing with other people and that he left or quit the other 10% is in itself incredible (R. 187-92). It is inconceivable that Kelly Services would keep among their temporary worker force anyone as unreliable as Plaintiff claims to have been. Thus, a reasonable fact finder could conclude that this testimony was an exaggeration made at the hearing in an effort to get disability benefits.

that Plaintiff is "disabled" is undermined by his own analysis[11] as well as Dr. Tsai's December 17, 2003, determination that Plaintiff could do light, unskilled work and that his ability to concentrate, interact with coworkers and complete a full work week were only moderately impaired.[12]

ALJ Varga found that Plaintiff's exertional limitations do not allow him to perform the full range of light work; however, there are a significant number of jobs in the national economy which he could perform, chiefly as an office cleaner on the second or third shifts, including 3,500 such jobs in southeastern Michigan.

Further, when evaluating Plaintiff's mental impairments, 20 C.F.R. § 404.1520a(e)(1) requires the ALJ to consider activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. The ALJ must take into account:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

---

[11] In his notes, Dr. Luby remarked that Plaintiff undertook independent work as a screenwriter and day trader (R. 130, 136). After Plaintiff returned from medical school, Dr. Luby encouraged him to pursue work using his engineering degree (R. 161). Further, Dr. Luby opined that Plaintiff did not have job due to the fact that he is not looking for a job "in a positive labor market ... with any energy" noting that when Plaintiff finds employment "he will work for awhile on a job and then quit" (R. 139, 132).

[12] Plaintiff's contention that Dr. Luby's letter to the Appeals Council showed his responses to the Mental Impairment Questionnaire were confused and in error is considered in the next section of this Report.

SSR 85-16.

20 C.F.R. §§404.1520a(c)(1) requires consideration of "all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment".[13]  In addition, under §404.1520a(c)(2) the decision maker must consider the extent to which the mental impairment interferes with an "ability to function independently, appropriately, effectively, and on a sustained basis" including "such factors as the quality and level of [ ] overall functional performance, any episodic limitations [and] the amount of supervision or assistance [ ] require[d]."

Much of this analysis is done in a Psychiatric Review Technique Form (PRTF).  Prior to October 2000, the PRTF was completed at the state agency level and a form was completed by the ALJ and attached to the decision.  SSA revised its regulation in September 2000 and modified 20 C.F.R. § 404.1520a(e)(2) to no longer require the ALJ to complete and attach a PRTF.  Instead, the ALJ in the decision:

> must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

_____

[13] 20 C.F.R.  §404.1545(c) requires consideration of "residual functional capacity for work activity on a regular and continuing basis" and a "limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting."

20 C.F.R. §404.1520a(e)(2)

Again the paragraph (c) referred to lists the functional areas of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. 20 C.F.R. §404.1520a(c). Here, ALJ Varga considered and made findings on areas of moderate limitations in understanding and maintaining attention and concentration (R. 24). He properly incorporated these – as well as some factors on social functioning with the public and dealing with supervisors – in his hypothetical question to the VE (R. 202). ALJ Varga's analysis of the mental evidence runs for several pages (R. 18-22) and seeks to "show the significant history, including examination . . . findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment . . . [and which] include[s] a specific finding as to the degree of limitation in each of the functional areas" of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.

ALJ Varga rejects Dr. Luby's GAF as too low and Dr. Luby's conclusion that Plaintiff is disabled from all work, he nonetheless accommodates many of Dr. Luby's findings into his analysis and his hypothetical with restrictions to avoid most contact with other workers or supervisors and allowing the worker to work at his own pace.

ALJ Varga's analysis of the record and his hypothetical questions to VE Brown evidence a careful examination of the factors affecting Plaintiff's mental health. The ALJ's findings in this regard are consistent with those found in the PRTF. Therefore, ALJ Varga properly considered Dr. Luby's medical opinions in making his disability determination, and his decision should be upheld.

2.    *Appeals Council Review:*

If the Social Security Appeals Council grants review of a claim, then the decision that the Council issues is the Commissioner's "final decision." If the Council denies the request for review, the ALJ's opinion becomes the final decision. Social Security Act, § 205(g), 42 U.S.C. § 405(g). The Appeals Council must consider new and material evidence in making its decision whether to review an ALJ's decision. *Falge v. Apfel*, 150 F.3d 1320, 1324 (11th Cir. 1998). The Appeals Council must evaluate new and material evidence submitted to it if the evidence relates to the period on or before the date of the ALJ's hearing decision. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir.19940. *See* 20 C.F.R. §§ 404.970(b), 416.1470(b). The Appeals Council must show in its written denial of review that it has adequately evaluated the new evidence. *Epps v. Harris*, 624 F.2d 1267, 1273 (5th Cir.1980). In the present case, the Appeals Council, in its December 22, 2006, letter showed that it had adequately evaluated and rejected the new evidence submitted by the Plaintiff.

This Court lacks jurisdiction to review the Appeals Council's decision not to reopen ALJ Varga's decision. Absent a colorable constitutional claim, a federal court has no jurisdiction to review the Commissioner's decision not to reopen an application for benefits. *Guy v. Commissioner of Social Sec.*, 89 F.3d 833 (6th Cir. 1996) (noting that the court lacks jurisdiction to review the Commissioner's decision absent a colorable constitutional claim). *See Califano v. Sanders*, 430 U.S. 99, 107-09 (1977) (concluding that the Administrative Procedures Act does not afford an implied grant of subject matter jurisdiction permitting federal judicial review of certain administrative actions); *See also Cottrell v. Sullivan*, 987 F.2d 342, 345 (6th Cir.1992).

Plaintiff's claim that refusal to remand in light of Dr. Luby's new letter violated Plaintiff's due process right to a fair hearing is insufficient to warrant the relief requested.

Plaintiff's counsel asserts that Dr. Luby was confused by the Mental Impairment Questionnaire and his letter to the Appeals Council clarified that and stated again his opinion concerning Plaintiff's disability. He notes erasures on the Mental Impairment Questionnaire (R. 110) show confusion.[14] Plaintiff's counsel does not refer to any portion of the record that has Dr. Luby's letter submitted to the Appeals Council and he does not attach it to his brief in this Court.

Were this a request for a remand under 42 U.S.C. § 405(g)[15] it could be allowed only upon a showing that there is new and material evidence and that good cause exists for failure to have the evidence included in the prior administrative record. The Sixth Circuit has been strict in applying these requirements. *See, e.g., Oliver v. Secretary*, 804 F.2d 964 (6th Cir. 1986); *Wilson v. Secretary*, 733 F.2d 1181 (6th Cir. 1984); *Willis v. Secretary*, 727 F.2d 551 (6th Cir. 1984); *Hutchinson v. Weinberger*, 399 F. Supp. 426, 428 (E.D. Mich. 1975) (denying plaintiff's motion for remand because "plaintiff has not made any showing of what evidence she wishes to submit for consideration, nor that such evidence is necessary in order to afford her a fair hearing or would change the Secretary's decision").[16]

---

[14] The erasures noted on R. 110 are of markings in the wrong column, like the butterfly ballot in Florida. They do not indicate a misunderstanding of the questions being asked. He does seem to have incorrectly checked "Never" to question # 13 ( R. 113-14).

[15] The statutory provision reads:
> The court may . . . at any time order additional evidence to be taken before the Secretary, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

[16] In *Willis v. Secretary*, 727 F.2d 551 (6th Cir. 1984), plaintiff sought to have the case remanded for consideration of a psychiatric report prepared after the ALJ denied benefits, but before the Appeals Council issued the Secretary's final decision. 727 F.2d at 553. In affirming the district court's denial of plaintiff's motion to remand, the Sixth Circuit noted that plaintiff offered no explanation for failing to have the report prepared earlier and submitted to the ALJ in the initial proceedings. "Absent a demonstration of good cause to excuse the failure to

Here, the Mental Impairment Questionnaire was completed on February 16, 2004, well before the August 31, 2005, hearing before ALJ Varga. It would be clear to anyone experienced in handling Social Security disability claims that these responses were no where near sufficient to make out a claim for disability under the Listings. Indeed, much of the form suggests that with restrictions like those adopted by ALJ Varga in his hypothetical question, that such a worker could perform substantial gainful activity. Thus, there is no "good cause" for claimant's representative at the administrative level not attempting to get a more favorable opinion from Dr. Luby prior to the hearing. Thus, there is no ground upon which to support a remand under § 405(g), because there was plenty of time before the hearing to get a modified opinion and the Appeals Council's refusal to reopen the case does not involve a violation fo Plaintiff's due process rights.

## III.   RECOMMENDATION

For the reasons stated above, it is recommended that Defendant's Motion for Summary Judgment be **GRANTED** and Plaintiff's motion be **DENIED**. Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this

---

incorporate this evidence in the original hearing, we cannot order a remand for the purposes of requiring the Secretary to consider new evidence." 727 F.2d at 554.

Report and Recommendation. *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.

Note: any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than ten days after service an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

DATED: December 28, 2007              s/ Steven D. Pepe
                                     STEVEN D. PEPE
                                     United States Magistrate Judge

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing ***Report and Recommendation*** was served on the attorneys and/or parties of record by electronic means or U.S. Mail on December 28, 2007.

                                     s/ Alissa Greer
                                     Case Manager to Magistrate
                                     Judge Steven D. Pepe
                                     (734) 741-2298